OPINION
 

 By the Court,
 

 Gibbons, C. J.:
 

 Petitioners challenge real parties in interest’s candidacies for state offices or positions on local governing bodies based on the Nevada Constitution’s Article 15, Section 3(2) term-limit amendment. That amendment, which became effective in late November 1996, provides that a person may not serve more than 12 years in any state office or as a member of any local governing body. The primary question presented here is whether that amendment applies to an individual who was elected to a term of office before the amendment’s effective date but commenced serving in that office thereafter. In addressing that question, we reaffirm precedent concluding that the amendment was validly enacted.
 

 As viewed prospectively from its November 1996 effective date, the term-limit amendment applies to all years served in office after that date, even though the office may have been filled by virtue of the 1996 election before the amendment became effective. Thus, any candidate for a state office or position on a local governing body, who, like real parties in interest, has served 12 years or more after the November 1996 effective date is barred by the term-limit amendment from further service in that position. Although the amendment was presented to the voters in a slightly varied format during two successive general elections, the amendment’s language was identical in both, clear in its content, and twice approved by the voters. As we have already recognized in
 
 *584
 

 Nevada Judges Ass’n
 
 v.
 
 Lau
 

 [1]
 

 and
 
 Rogers v.
 
 Heller,
 
 [2]
 
 and without compelling reasons for overturning that precedent, we reaffirm that the amendment was validly enacted, and we conclude that, under its plain terms, real parties in interest are barred from seeking reelection.
 

 RELEVANT FACTS
 

 In Nevada’s 1994 general election, voters approved a citizen initiative proposing to amend Nevada’s Constitution to preclude a person from serving in a public office or on a local governing body for more than 12 years. At that time, the proposed amendment was submitted to the voters in the form of a single question, Question 9, which encompassed elected officials from all three branches of government. For the amendment to become effective as part of Nevada’s Constitution, Question 9 was required to be resubmitted to (and approved by) the voters at the 1996 general election “in the same manner” as it had been submitted to the voters in the 1994 election.
 
 [3]
 

 Before Question 9 was resubmitted to the voters in 1996, the Nevada Judges Association filed a petition for a writ of mandamus with this court, seeking an order directing the Nevada Secretary of State to remove from the proposed term-limit amendment any limitation to the number of terms that members of the judiciary could serve.
 
 [4]
 
 In the resulting decision,
 
 Nevada Judges Ass’n v. Lau,
 

 [5]
 

 we denied the Association’s request to exclude judges from the proposal. Because the initiative, as presented and explained on the 1994 election ballot, failed to adequately inform voters of the nature and effect of term limits on the judiciary,
 
 [6]
 
 however, the Secretary of State was directed to clarify the term limit’s effect by presenting the initiative “in the form of two questions, enabling voters to vote yes or no in regard to term limits for non-judicial public officers and yes or no in regard to term limits for judges and justices.”
 
 [7]
 
 Thus, on the 1996 ballot, the initiative was presented in two parts, each with “its own respective explanation and arguments.”
 
 [8]
 

 
 *585
 
 Nevada’s 1996 general election was held on November 5. On that date, the voters again approved the term-limit amendment for nonjudicial public officers but disapproved the proposed amendment as to the judiciary. Thereafter, on November 27, 1996, following a canvass of the November 5 election results, the approved term-limit amendment became effective as part of the Nevada Constitution.
 
 [9]
 
 The amendment was included in Nevada’s Constitution as Article 15, Section 3(2):
 

 No person may be elected to any state office or local governing body who has served in that office, or at the expiration of his current term if he is so serving will have served, 12 years or more, unless the permissible number of terms or duration of service is otherwise specified in this Constitution.
 

 Now, nearly 12 years later, several elected officials who have concededly held their positions since 1997 dispute whether the term-limit amendment applies to bar them from serving another term starting in 2009. Thus, in these consolidated writ proceedings, the Nevada Secretary of State, petitioner Ross Miller, and an elector, Steve Sisolak, challenge the qualifications of eight candidates, real parties in interest, currently running for reelection to certain state offices and local governing bodies.
 
 [10]
 

 Real parties in interest were originally elected or reelected to their various state offices and local positions in the November 1996 general election. They do not dispute that they commenced serving their respective terms in office in January 1997. Thereafter, real parties in interest retained their offices through reelection; they will have completed their twelfth years of service since the term-limit amendment became effective when their current terms expire at the end of this year, 2008. Nevertheless, real parties in interest have asked respondents, filing officers for Washoe, Clark, and Churchill Counties, to include their names on the 2008 primary and general election ballots as candidates for the next
 
 *586
 
 terms of their offices, beginning in January 2009. According to petitioners, if each real party in interest is reelected and begins serving another term of office in 2009, that year will constitute his or her thirteenth year serving in the same office after the Nevada Constitution’s 12-year term-limit provision became effective.
 

 After real parties in interest filed their candidacies, petitioners submitted to the appropriate filing officers, under NRS 293.182, written challenges to real parties in interest’s qualifications.
 
 [11]
 
 They alleged that real parties in interest were not qualified to run for another term in their current offices because, at the expiration of their current terms in 2008, they will have already completed the maximum number of years that they are allowed to serve under Article 15, Section 3(2) of the Nevada Constitution.
 

 As required by NRS 293.182, the filing officers transmitted the challenges to the counties’ respective district attorneys for determinations as to whether probable cause existed to support the allegation. The district attorneys determined that no probable cause existed, and therefore, they declined to file petitions in district court regarding real parties in interest’s qualifications for reelection to their current offices. These writ proceedings followed.
 

 In their petitions, petitioners seek writs of mandamus directing the filing officers — the Washoe and Clark County Registrars of Voters and the Churchill County Clerk — to exclude real parties in interest’s names from the 2008 primary and general election ballots, under the Nevada Constitution’s Article 15, Section 3(2) term-limit provision.
 
 [12]
 

 As directed, real parties in interest have filed answers, as has the Washoe County Registrar of Voters. After the answers were filed, the Legislature was granted leave to intervene and the United States Term Limits Foundation was permitted to file an amicus curiae brief. In addition to asserting that terms of office filled pursuant to the 1996 election do not count toward the 12-year limit, the issues raised in response to these petitions go to the very validity of the amendment, as well as to the propriety of the requested relief.
 

 DISCUSSION
 

 As an initial matter, several real parties in interest and the Washoe County Registrar of Voters have challenged the propriety
 
 *587
 
 of writ relief in the first instance. After addressing that threshold issue, we turn to the primary question raised in these writ proceedings: whether Article 15, Section 3(2)’s 12-year term limit applies to real parties in interest’s terms of office that were served by virtue of the November 1996 election. In the context of answering this question, we address the Legislature’s arguments that the amendment was not constitutionally enacted.
 

 The propriety of writ relief
 

 As noted, petitioners seek a writ of mandamus directing the Washoe and Clark County Registrars of Voters and the Churchill County Clerk to exclude the names of real parties in interest from the 2008 primary and general election ballots.
 

 The writ of mandamus is available to compel the performance of an act that the law requires as a duty resulting from an office, trust, or station,
 
 [13]
 
 or to control a manifest abuse of discretion.
 
 [14]
 
 Mandamus is an extraordinary remedy, and whether a petition will be considered is within our sole discretion.
 
 [15]
 

 Generally, we will not consider a petition for a writ of mandamus when a plain, speedy, and adequate legal remedy exists.
 
 [16]
 
 Here, several real parties in interest and the Washoe County Registrar of Voters contend that writ relief is inappropriate because an adequate legal remedy is available under NRS 293.182. That statute allows an elector to contest a candidate’s qualifications for office by filing a written challenge with the office’s filing officer.
 
 [17]
 
 The filing officer must then forward the challenge to the appropriate district attorney or, if the filing officer is the Secretary of State, to the Attorney General.
 
 [18]
 
 If the district attorney or the Attorney General then determines that probable cause exists to support the challenge,
 
 [19]
 
 he or she will seek in the district court an order that the challenged candidate appear and show cause why the challenge is not valid.
 
 [20]
 
 On an expedited hearing, if the court determines that the challenged candidate does not qualify for office,
 
 *588
 
 “[t]he person is disqualified from entering upon the duties of the office” and the candidate’s name may not appear on the election ballot.
 
 [21]
 

 Here, petitioners availed themselves of NRS 293.182 by filing written challenges, but the district attorneys in these matters ultimately determined that no probable cause existed to support them and did not petition the district court for relief.
 
 [22]
 
 Thus, in this instance, NRS 293.182 provided no means by which these issues of statewide constitutional importance could be addressed by a court of law.
 
 [23]
 

 In Nevada, the Secretary of State is mandated to, among other things, uphold Nevada’s Constitution, execute and enforce Nevada’s election statutes, and administer Nevada’s election process.
 
 [24]
 
 When the statutory process failed to afford an avenue of legal redress, the Secretary of State pursued his election law duties by timely petitioning, along with Sisolak, to this court for relief. In light of these term-limit issues’ statewide significance, the upcoming election, the apparent confusion surrounding real parties in interest’s candidacies, and the nonavailability of another adequate means of securing legal review, we exercise our discretion to proceed with these petitions.
 
 [25]
 
 Because we will not decide constitu
 
 *589
 
 tional questions unless necessary,
 
 [26]
 
 in resolving these petitions, we first determine whether Article 15, Section 3(2) operates to bar real parties in interest from office in 2009.
 
 [27]
 

 Article 15, Section 3(2)’s application
 

 Whether the Nevada Constitution’s Article 15, Section 3(2) term limit precludes real parties in interest’s names from appearing on the 2008 election ballots is fundamentally a question of whether that amendment applies to their first terms of office served after the amendment’s effective date. After first noting when the term-limit amendment became effective, we discuss whether, given its effective date, it precludes real parties in interest from being elected to any further terms in their respective offices.
 

 Article 15, Section 3(2)’s effective date
 

 In
 
 Torvinen
 
 v.
 
 Rollins,
 
 we concluded that a constitutional amendment adopted through the initiative process becomes effective on “the canvass of the votes by the supreme court”
 
 [28]
 
 and, as of that date, has prospective application, unless the amendment specifically provides otherwise.
 
 [29]
 
 Accordingly, all parties agree that Article 15, Section 3(2) became effective on the canvass of November 27, 1996. Moreover, Article 15, Section 3(2) is “to be given only prospective application from its effective date,’ ’ since any intent to make it retrospective does not clearly appear from the provision’s terms.
 
 [30]
 
 Thus, the term-limit provision applies prospectively from November 27, 1996.
 

 
 *590
 

 Applying term limits prospectively
 

 While the parties generally agree that the term-limit provision applies prospectively from November 27, 1996, they dispute whether the prospective application includes within the years-of-service limitation terms served pursuant to the 1996 election. Specifically, petitioners assert that, even though the term-limit provision did not become effective until after the election, the term limit applies to terms of office that were filled based on that election, since the elected representatives did not commence serving in their offices until after the provision’s effective date. In response, real parties in interest, the Washoe County Registrar of Voters, and the Legislature argue that terms of office filled by virtue of the 1996 election do not count toward the 12-year term limit because the real parties in interest were elected before the term-limit provision became effective. In so arguing, they rely on a statement in
 
 Torvinen
 
 providing that the amendment at issue in that case “applie[d] prospectively only to elections held after its effective date,’ ’
 
 [31]
 
 and they contend that any other interpretation would constitute an improper retrospective application of the term limit.
 

 Article 15, Section 3(2)’s language
 

 To determine a constitutional provision’s meaning, we turn first to the provision’s language. In so doing, we give that language its plain effect, unless the language is ambiguous.
 
 [32]
 
 If a constitutional provision’s language is ambiguous, meaning that it is susceptible to “two or more reasonable but inconsistent interpretations,”
 
 [33]
 
 we may look to the provision’s history, public policy, and reason to determine what the voters intended.
 
 [34]
 
 Conversely, when a constitutional provision’s language is clear on its face, we will not go beyond that language in determining the voters’ intent
 
 [35]
 
 or to create an ambiguity when none exists.
 
 [36]
 
 Whatever meaning ultimately is
 
 *591
 
 attributed to a constitutional provision may not violate the spirit of that provision.
 
 [37]
 

 As noted above, Article 15, Section 3(2) provides that “[n]o person may be elected to any state office or local governing body who has served in that office, or at the expiration of his current term if he is so serving will have served, 12 years or more.”
 
 [38]
 
 Here, Article 15, Section 3(2) is clear on its face: if a person “has served” in an office or “will have
 
 served”
 
 in that office for 12 years or more by the time his or her current term expires, the person may not be elected to that office. As the Secretary of State and Sisolak point out, the provision focuses on years of service, not elections. And nothing in it exempts from its purview years of service commencing after its effective date pursuant to the 1996 election. Thus, under Article 15, Section 3(2)’s plain language, so long as a service year commences after the Article’s effective date, it constitutes a year of service for limitation purposes.
 

 Nonetheless, real parties in interest argue that an alternative interpretation of Article 15, Section 3(2) exists, rendering that provision ambiguous. Further, they point out that any ambiguity must be resolved in favor of eligibility to office.
 
 [39]
 
 In particular, real parties in interest argue that, because that provision’s first clause uses the phrase “[n]o person may be elected” after 12 years of service, “ ‘election’ is the event that will trigger the ‘clock’ for term limits.” But a provision is ambiguous only when a reasonable alter
 
 *592
 
 native interpretation exists, and the phrase “[n]o person may be elected’ ’ clearly refers to the result of having already served 12 years in an office, not the commencement of the 12-year service period. Thus, real parties in interest resort to “ingenuity to create ambiguity’ ’ that does not exist in the amendment and that cannot serve to defeat the amendment’s clear language.
 
 [40]
 
 Accordingly, Article 15, Section 3(2)’s term limit applies to offices filled pursuant to the 1996 election if the office’s term did not commence until after the term limit’s November 27 effective date.
 

 Nonretrospective application
 

 Further, applying Article 15, Section 3(2) to preclude real parties in interest from serving in the same position in 2009 does not constitute an impermissible retrospective application. In
 
 Public Employees’ Benefits Program
 
 v. LVMPD,
 
 [41]
 
 we recognized that “just because a statute draws upon past facts does not mean that it operates ‘retrospectively.’ ”
 
 [42]
 
 Instead, we noted, “ ‘[a] statute has retroactive effect when it ‘ ‘takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past.” ’ ”
 
 [43]
 
 In determining whether the law’s application would be impermissibly retrospective, “courts are guided by fundamental notions of ‘fair notice, reasonable reliance, and settled expectations.’ ”
 
 [44]
 

 Here, real parties in interest argue that because an individual’s years of service are necessarily linked to the individual’s election, including within a years-of-service calculation those terms that were filled based on an election held before the term-limit amendment became effective is an impermissible retrospective application
 
 *593
 
 of the term-limit amendment. Although terms of service are necessarily connected to an election, the election itself does not impart any right to be free from term limits on future years of service. Therefore, applying the term-limit amendment to years of official service that commenced after the amendment’s effective date would not divest or impair any legal rights stemming from the public office to which real parties in interest were elected. Nor would it create a new obligation, impose a new duty, or attach a new disability in respect to transactions or considerations already past because none of the years of service included in petitioners’ 12-year calculation had begun by the term limit’s effective date, November 27, 1996.
 
 [45]
 
 Therefore, calculating the 12-year term limits from the first year of service occurring after the November 27, 1996, effective date, as the amendment’s plain language directs, constitutes a prospective-only application.
 

 The conclusion of Torvinen
 

 Although in
 
 Torvinen v. Rollins
 
 we stated that the amendment at issue in that case “applie[d] prospectively only to elections held after its effective date,’ ’
 
 [46]
 
 real parties in interest misinterpret that statement’s significance.
 
 Torvinen
 
 concerned an amendment to Nevada’s Constitution, passed through the ballot initiative process,
 
 [47]
 
 that increased the elective term of office for district court judges from four to six years.
 
 [48]
 
 In
 
 Torvinen,
 
 the appellant had sought a declaratory judgment in the district court that the amendment did not affect the terms of incumbent district court judges, but the district court ruled that the amendment applied retrospectively to judges already in office.
 
 [49]
 
 On appeal, this court concluded that the amendment became effective “upon the canvass of the votes by the supreme court” and “applie[d] prospectively only to elections held after its effective date.”
 
 [50]
 
 As a result, the newly approved six-year term applied only to judges
 
 elected
 
 after the canvass.
 

 Based on that conclusion, real parties in interest assert that the term-limit amendment in this case also must “appl[y] prospectively only to elections held after its effective date.”
 
 [51]
 
 Thus, according to real parties in interest, under
 
 Torvinen,
 
 the term-limit amendment
 
 *594
 
 here did not apply until the first election after its effective date and their first terms of service following the effective date do not count towards the limitation period.
 

 But the amendment in
 
 Torvinen,
 
 unlike the term-limit amendment, changed the term of the office to which a candidate was elected;
 
 i.e.,
 
 a district court judgeship was no longer a four-year term of service but a six-year term of service.
 
 [52]
 
 To apply the amendment to a district court judge elected during the same election that the voters approved the amendment would fundamentally alter the office to which the judge had been elected, and consequently, the elected judge’s vested rights and the public’s settled expectations — the judge had been elected to a four-year term but would nonetheless serve a six-year term. As such, applying that amendment to an election that took place before the amendment became effective would constitute an impermissible retrospective application, regardless of when the judge commenced serving the term. Thus, because the amendment in
 
 Torvinen
 
 altered the term of the affected office, it could only be properly prospectively applied to elections following the amendment’s adoption.
 
 [53]
 

 Here, the term-limit amendment does not change the terms of the offices to which real parties in interest were elected. Instead, it merely limits the total number of years that one individual may serve in an office. Thus, although real parties in interest were elected to their terms before the term-limit provision’s effective date, applying that provision to terms that did not commence until after its effective date does not constitute a retrospective application-real parties in interest commenced serving in the same offices to which they were elected, which remained essentially unaffected by the scope of the term-limit amendment.
 
 [54]
 
 At the
 
 *595
 
 expiration of their current terms, real parties in interest will have served for 12 years since Article 15, Section 3(2)’s effective date. Therefore, they may not, under that provision’s plain language, be reelected.
 
 [55]
 

 Article 15, Section 3(2) ’s validity
 

 Having determined that Article 15, Section 3(2) bars real parties in interest from office in 2009, we necessarily address the Legislature’s argument that the amendment is invalid and unenforceable.
 
 [56]
 
 In challenging a voter-enacted constitutional amendment postelection, the Legislature “bear[s] a heavy burden of persuasion,” given the presumptive soundness afforded to the vote of the people.
 
 [57]
 
 As stated by the Michigan Supreme Court, with respect
 
 *596
 
 to constitutional amendments made through voter initiatives, “ ‘every reasonable presumption, both of law and fact, is to be indulged in favor of the legality of the amendment, which will not be overthrown, unless illegality appears beyond a reasonable doubt.’ ”
 
 [58]
 

 According to the Legislature, the ballot question underlying Article 15, Section 3(2), Question 9, suffered from two infirmities: (1) in 1996, the question was not presented “in the same manner” as it was in 1994, as the constitution requires; and (2) it confused voters.
 

 “In the same manner”
 

 Concerning the Legislature’s argument that Article 15, Section 3(2) is invalid because Question 9 was not presented in 1996 “in the same manner” as it was in 1994, the Nevada Constitution provides that, if a majority of the voters approve a ballot question to amend Nevada’s Constitution, the question shall be resubmitted to the voters “at the next succeeding general election in the same manner as such question was originally submitted.”
 
 [59]
 
 The Legislature argues that Question 9 was not submitted in the same manner because, in 1996, it appeared on the ballot in two subsections, due to the
 
 Nevada Judges Ass’n v. Lau
 
 opinion.
 

 This court has already considered this argument, twice. In
 
 Lau,
 
 the court implicitly acknowledged that presenting Question 9 in the form of two parts in 1996 complied with the “in the same manner” requirement when we recognized that “[i]f either proposal passes in the 1996 general election, the Constitution will be effectively amended as to the proposal or proposals receiving a majority vote.’ ,
 
 [60]
 
 Then, a few years later, this court noted in
 
 Rogers v. Heller
 
 that initiatives must be kept intact so as not to obstruct the people’s voice and pointed out that this requirement was met in
 
 Lau
 
 because the decision in
 
 Lau
 
 “to sever the initiative petition into two questions did not change the petition’s substance.’ ’
 
 [61]
 

 
 *597
 
 These decisions now hold positions of permanence in this court’s jurisprudence — precedent that, under the doctrine of
 
 stare decisis,
 

 [62]
 

 we will not overturn absent compelling reasons for so doing.
 
 [63]
 
 Mere disagreement does not suffice.
 
 [64]
 
 Thus, as no party has pointed to “weighty and conclusive” reasons for negating the voters’ decade-long expectation that term limits, whenever effective, are a political reality,
 
 [65]
 
 we will not disturb our prior conclusion that the 1996 term-limit ballot question was constitutionally presented in the “same manner” as it was presented in 1994.
 

 Confusing language
 

 As regards the Legislature’s argument that the term-limit ballot question’s language confused voters,
 
 [66]
 
 the Legislature’s contention presents us with the unenviable task of determining whether voters were confused or misled by the ballot question when they
 
 *598
 
 approved it over a decade ago. Other than pointing to the ballot question’s language and posing hypotheticals, however, the Legislature has not provided us with any evidence — much less evidence beyond a reasonable doubt — that voters were indeed confused or misled by that language approximately 12 years ago.
 

 Without strong evidence showing that voters were confused or misled, to now determine, in hindsight, that they were, is nearly impossible. Moreover, the significant consequences of invalidating a voter-enacted constitutional amendment based on the language of the ballot question underlying it, after this state’s constituents and would-be candidates have been relying on its existence for over one decade is likewise problematic. These are the very types of problems that the laches doctrine was designed to avoid.
 

 “ ‘Laches is an equitable doctrine which may be invoked when delay by one party works to the disadvantage of the other, causing a change of circumstances which would make the grant of relief to the delaying party inequitable.’ ’ ’
 
 [67]
 
 To determine whether a challenge is barred by the doctrine of laches, this court considers (1) whether the party inexcusably delayed bringing the challenge, (2) whether the party’s inexcusable delay constitutes acquiescence to the condition the party is challenging, and (3) whether the inexcusable delay was prejudicial to others.
 
 [68]
 
 According to the Legislature, it did not inexcusably delay bringing this challenge to Article 15, Section 3(2)’s validity because it was not ripe for review until this year, when real parties in interest’s candidacies were challenged under Article 15, Section 3(2).
 

 But the Legislature is challenging the clarity of the ballot question’s language. This sort of procedural challenge is ripe for judicial review preelection, before the ballot question is presented to the voters, “since the question to be resolved is whether [the] proposal has satisfied all constitutional and statutory requirements for placement on the ballot.”
 
 [69]
 
 To acquiesce to the ballot question’s language before the 1994 and 1996 general elections only to challenge now whether it satisfied requirements for placement on the
 
 *599
 
 ballot 12 years ago is unconventional. And to consider the challenge and resolve it in the Legislature’s favor would be prejudicial to the voters who for the last 12 years have been relying on the amendment that they approved and its now imminent implementation. Had the Legislature successfully challenged the ballot question’s language 12 years ago, the voters or the question’s proponents potentially could have remedied the question’s infirmities by proposing a similar 12-year term-limit amendment in the immediately following general elections. We thus conclude that the doctrine of laches applies and, consequently, precludes the Legislature from challenging the term-limit ballot question’s clarity. As no other challenges to the amendment’s enactment has been timely made, we conclude that it was validly enacted into law.
 

 CONCLUSION
 

 Article 15, Section 3(2) plainly states that if a person has served, or at the conclusion of his or her current term will have served, 12 years or more in an office or a position on a local governing body, that person may not be reelected to that office or position. We can neither ignore Article 15, Section 3(2)’s clear import nor construe its plain language. Further, without any demonstration that precedent concluding that Question 9 met the constitutional “same manner” requirement is clearly erroneous, we may not disavow it. Thus, we reiterate that the Nevada Constitution’s Article 15, Section 3(2) term-limit amendment was validly enacted.
 

 Thus, because real parties in interest, at the conclusion of their current terms, will have served at least 12 years in their respective offices, they may not be elected to their current positions. Accordingly, we grant these petitions in part,
 
 [70]
 
 and we direct the clerk of this court to issue a writ of mandamus to respondents, directing them to exclude real parties in interest’s names from the 2008 general election ballot.
 

 Maupin, Hardesty, Parraguirre, Douglas, Cherry and Saitta, JJ., concur.
 

 [1]
 

 112 Nev. 51, 910 P.2d 898 (1996).
 

 [2]
 

 117 Nev. 169, 18 P.3d 1034 (2001).
 

 [3]
 

 See
 
 Nev. Const. art. 19, § 2(4).
 

 [4]
 

 Nevada Judges Ass’n v. Lau,
 
 112 Nev. 51, 910 P.2d 898.
 

 [5]
 

 Id.
 

 [6]
 

 Id.
 
 at 60, 910 P.2d at 903.
 

 [7]
 

 Id. at 60, 910 P.2d at 904.
 

 [8]
 

 Id.
 

 [9]
 

 See Torvinen v. Rollins,
 
 93 Nev. 92, 94, 560 P.2d 915, 917 (1997) (noting that a constitutional amendment adopted through the ballot initiative process becomes effective on “the canvass of the votes by the supreme court”).
 

 [10]
 

 The Secretary of State’s petition challenges the following candidates: Howard Rosenberg (University System Board of Regents, Washoe County); James Ainsworth (Sun Valley General Improvement District Trustee, Washoe County); Thalia Dondero (University System Board of Regents, Clark County); Ruth Johnson (Clark County School District Board of Trustees); Mary Beth Scow (Clark County School District Board of Trustees); Bruce Woodbury (Clark County Commissioner); Lynn Pearce (Churchill County Commissioner); and Harold Newman (Mosquito, Vector & Weed Abatement Board, Churchill County). Steve Sisolak, who is a candidate for Clark County Commissioner, also challenges Commissioner Woodbury’s candidacy.
 

 [11]
 

 NRS 293.182 allows an elector to make, with the filing officer for an office, a written challenge to an individual’s candidacy for the office on the ground that the candidate has failed to meet any constitutional or statutory qualification required to hold that office.
 

 [12]
 

 Sisolak also seeks, in the alternative, a writ of prohibition. Because prohibition is used to control the exercise of judicial functions only,
 
 see
 
 NRS 34.320, it does not apply here, and therefore, we consider Sisolak’s alternative request for mandamus.
 

 [13]
 

 NRS 34.160;
 
 see also Smith
 
 v.
 
 District Court,
 
 107 Nev. 674, 818 P.2d 849 (1991).
 

 [14]
 

 Round Hill Gen. Imp. Dist. v. Newman, 91
 
 Nev. 601, 637 P.2d 534 (1981).
 

 [15]
 

 See Smith,
 
 107 Nev. at 677, 818 P.2d at 851.
 

 [16]
 

 See
 
 NRS 34.170; NRS 34.330.
 

 [17]
 

 See
 
 NRS 293.182(1).
 

 [18]
 

 NRS 293.182(3)(a) and (b).
 

 [19]
 

 NRS 293.182(4).
 

 [20]
 

 Id.
 

 [21]
 

 NRS 293.182(5)(a) and (b).
 

 [22]
 

 Conversely, a case currently pending before this court,
 
 Plimpton
 
 v.
 
 State,
 
 Docket No. 51944, is an appeal from a district court order disqualifying candidates for office based on Article 15, Section 3(2)’s term limit, entered after the Pershing and Humboldt County district attorneys determined that probable cause existed to support written challenges to the candidates’ qualifications under that provision, and thus, petitioned the district court for relief.
 

 [23]
 

 NRS 293.182 provides no opportunity for relief once the district attorney or the Attorney General makes a no probable cause determination. Nor does it allow the Attorney General to review the district attorney’s probable cause determination with respect to locally filed candidates, as some parties have suggested.
 
 See
 
 NRS 293.182(3)(a) and (b) (indicating that the Attorney General makes the probable cause determination with regard to a written challenge when the Secretary of State is the filing officer for the office pertaining to the challenged candidate).
 

 [24]
 

 See
 
 Nev. Const. art. 15, § 2; NRS 293.124;
 
 Secretary of State v. Nevada State Legislature,
 
 120 Nev. 456, 461, 93 P.3d 746, 750 (2004) (recognizing the Nevada Secretary of State’s duty to “obtain and maintain consistency in the application, operation^] and interpretation of election laws”).
 

 [25]
 

 Salaiscooper
 
 v.
 
 Dist. Ct.,
 
 117 Nev 892, 901-02, 34 P.3d 509, 515-16 (2001) (recognizing that even when adequate legal means exist, if the legal issues impart urgency and necessity of sufficient magnitude this court’s intervention might be warranted);
 
 Walker v. Dist. Ct.,
 
 120 Nev. 815, 819, 101 P.3d 787, 790 (2004) (noting that, in determining whether to invoke our original jurisdiction, this court considers factors such as whether the petition raises important legal issues that are in need of clarification and whether public policy is served by our intervention).
 

 [26]
 

 See Spears
 
 v.
 
 Spears,
 
 95 Nev. 416, 418, 596 P.2d 210, 212 (1979) (“This court will not consider constitutional issues which are not necessary to the determination of an appeal”).
 

 [27]
 

 Several real parties in interest and the Washoe County Registrar of Voters also argue that, because fding officers are not required by law to exclude a candidate from a ballot so long as the candidate provides the declaration required by statute, an extraordinary writ directing those fding officers to exclude a candidate from the ballot for reasons unrelated to the candidate’s compliance with declaration of candidacy is improper. That argument is unpersuasive. Because, as discussed below, real parties in interest have not met the Article 15, Section 3(2) qualification for reelection, the law requires that their names be excluded from the 2008 election ballots.
 
 See
 
 NRS 293.182(5)(a) (providing that, if a candidate “fails to meet any qualification required for . . . office pursuant to the Constitution or a statute of this [s]tate,” the candidate’s name must not appear on the ballot for the election to the office). Thus, even though no law directs the filing officers to inquire into a candidate’s qualifications for office, a writ of mandamus may issue to require the filing officers to comply with the law by excluding the candidates’ names from the ballot.
 

 [28]
 

 93 Nev. 92, 94, 560 P.2d 915, 917 (1977).
 

 [29]
 

 Id.
 

 [30]
 

 Id.
 

 [31]
 

 Id.
 

 [32]
 

 See McKay
 
 v.
 
 Bd. of Supervisors,
 
 102 Nev. 644, 648-49, 730 P.2d 438, 441 (1986);
 
 see also Rogers
 
 v.
 
 Heller,
 
 117 Nev. 169, 176 n.17, 18 P.3d 1034, 1038 n.17 (2001) (recognizing that the rules of statutory construction apply when interpreting constitutional provisions).
 

 [33]
 

 Gallagher
 
 v.
 
 City of Las Vegas,
 
 114 Nev. 595, 599, 959 P.2d 519, 521 (1998).
 

 [34]
 

 McKay,
 
 102 Nev. at 649, 730 P.2d at 442;
 
 see also Beazer Homes Nevada, Inc.
 
 v.
 
 Dist. Ct.,
 
 120 Nev. 575, 582, 97 P.3d 1132, 1137 (2004).
 

 [35]
 

 McKay,
 
 102 Nev. at 648, 730 P.2d at 441.
 

 [36]
 

 Falcke
 
 v.
 
 Douglas County,
 
 116 Nev. 583, 588, 3 P.3d 661, 664 (2000) (providing that, when a statute’s language is clear, this court generally is “ ‘not permitted to search for its meaning beyond the statute itself’ ” (quoting
 
 Charlie Brown Constr. Co. v. Boulder City,
 
 106 Nev. 497, 503, 797 P.2d 946,
 
 *591
 
 949 (1990),
 
 overruled on other grounds by Calloway
 
 v.
 
 City of Reno,
 
 116 Nev. 250, 993 P.2d 1259 (2000)));
 
 see also Cirac v. Lander County,
 
 95 Nev. 723, 729, 602 P.2d 1012, 1016 (1979) (noting that, “[i]f the words of a statute are clear, [this court] should not add to or alter them to accomplish a purpose not on the face of the statute”).
 

 [37]
 

 See McKay,
 
 102 Nev. at 648, 730 P.2d at 441.
 

 [38]
 

 Real party in interest Howard Rosenberg suggests that as a candidate for a position on the University System Board of Regents, Article 15, Section 3 does not apply to him at all. Specifically, Rosenberg contends that the Board of Regents position is neither a state office nor a position on a local governing body. But, under NRS 293.109(10), “state officer” is defined to include a position on the University System Board of Regents.
 
 See also Van Arsdell v. Shumway,
 
 798 P.2d 1298, 1301 (Ariz. 1990) (noting that “state office” includes “any other office for which the electors of the entire state or subdivision of the state greater than a county are entitled to vote”); 96-23 Op. Att’y Gen. 101, 109 (1996) (“Members of the board of regents would also be subject to the term limitation under the ‘any state office’ limitation.”).
 

 [39]
 

 See Nevada Judges Ass’n
 
 v.
 
 Lau,
 
 112 Nev. 51, 55, 910 P.2d 898, 901 (1996) (noting that because the right to hold office is valuable it should not be limited, unless done so by clear provisions of law, and that any ambiguity with respect to such provisions will be “ ‘resolved in favor of eligibility to office’ ” (quoting
 
 Gilbert v. Breithaupt,
 
 60 Nev. 162, 165-66, 104 P.2d 183, 185 (1940)).
 

 [40]
 

 Rothschild v. United States,
 
 179 U.S. 463, 465 (1900);
 
 see also U.S. v. Williams,
 
 15 F.3d 1356, 1359 (6th Cir. 1994).
 

 [41]
 

 124 Nev. 138, 155, 179 P.3d 542, 553 (2008).
 

 [42]
 

 Id.
 
 (citing
 
 Landgraf v. USI Film Products,
 
 511 U.S. 244, 269 & n.24 (1994) (“Even uncontroversially prospective statutes may unsettle expectations and impose burdens on past conduct: a new property tax or zoning regulation may upset the reasonable expectations that prompted those affected to acquire property; a new law banning gambling harms the person who had begun to construct a casino before the law’s enactment or spent his life learning to count cards. Moreover, a statute is not made retroactive merely because it draws upon antecedent facts for its operation.” (internal quotations and citations omitted))).
 

 [43]
 

 Id.
 
 at 155, 179 P.3d at 553-54 (quoting
 
 INS
 
 v.
 
 St. Cyr,
 
 533 U.S. 289, 321 (2001) (quoting
 
 Landgraf,
 
 511 U.S. at 269)).
 

 [44]
 

 Id.
 
 at 155, 179 P.3d at 554 (quoting
 
 St. Cyr,
 
 533 U.S. at 321 (internal quotations and citations omitted),
 
 and
 
 citing
 
 Landgraf,
 
 511 U.S. at 269 n.23 (citing
 
 Miller
 
 v.
 
 Florida,
 
 482 U.S. 423, 430 (1987) (“A law is retrospective if it ‘changes the legal consequences of acts completed before its effective date.’ ” (internal citation omitted))).
 

 [45]
 

 See Landgraf, supra
 
 note 44;
 
 see also Un. Pac. R. R. v. Laramie Stock Yards,
 
 231 U.S. 190, 199 (1913) (providing that a retroactive statute gives “a quality or effect to acts or conduct which they did not have or did not contemplate when they were performed”).
 

 [46]
 

 93 Nev. 92, 94, 560 P.2d 915, 917 (1977).
 

 [47]
 

 Id.
 
 at 93 , 560 P.2d at 916.
 

 [48]
 

 Id.
 

 [49]
 

 Id.
 

 [50]
 

 Id.
 
 at 94, 560 P.2d at 917.
 

 [51]
 

 Id.
 

 [52]
 

 Id.
 
 at 93, 560 P.2d at 916.
 

 [53]
 

 Indeed, the
 
 Toiyinen
 
 court appears to acknowledge that the specific nature of the amendment in that case, not a more general principle of prospective application, caused it to prospectively apply the amendment only to fiiture elections. Specifically, the
 
 Toiyinen
 
 court stated that
 
 “the
 
 amendment applies prospectively only to elections held after its effective date,”
 
 see id.
 
 at 94, 560 P.2d at 917 (emphasis added), rather than more generally stating that “amendments in general apply prospectively only to elections held after their effective dates.”
 

 [54]
 

 Real parties in interest also rely on an opinion issued by the Nevada Attorney General’s Office in August 1996 to argue that the term-limit amendment was intended to apply only to elections following the 1996 election.
 
 See
 
 96-23 Op. Att’y Gen. 101 (1996). Their reliance on that opinion is misplaced for several reasons. First, in light of the term-limit amendment’s plain language, we may not go beyond that language to determine its meaning — the Attorney General’s Opinion may not be used to create an ambiguity when none exists. Second, the opinion is internally inconsistent — at one point stating that “term
 
 *595
 
 limitations will not apply to affected officials elected in the 1996 general election,”
 
 id.
 
 at 113, while contradictorily concluding that periods of service commencing after its effective date will be counted as a term for limitation purposes,
 
 id.
 
 at 113-14 — and thus does not provide clear support for real parties in interest’s position. Third, regardless of the Attorney General’s Opinion’s import, it is not binding authority on this court.
 
 See Cannon v. Taylor,
 
 88 Nev. 89, 493 P.2d 1313 (1972).
 

 [55]
 

 Certain real parties in interest assert that this conclusion violates equal protection principles because it potentially treats them differently than legislators, who are subject to a separate constitution-provided 12-year term limit.
 
 See
 
 Nev. Const. art. 1, § 8(5);
 
 id.
 
 art. 4, § 21; U.S. Const. amend. XIV;
 
 see also Clements v. Fashing,
 
 457 U.S 957, 962-63 (1982) (indicating that the United States Constitution’s Equal Protection Clause is implicated when states “enact legislation that may appear to affect similarly situated people differently”);
 
 Rico v. Rodriguez,
 
 121 Nev. 695, 703, 120 P.3d 812, 817 (2005) (recognizing that equal protection under Nevada’s Constitution is implicated when a statute treats similarly situated people differently). But that argument fails, since any difference in the amendments’ application results from the interaction of the term limits with the offices’ start date — not the classification of individuals that generally results from legislation.
 
 See Romer v. Evans,
 
 517 U.S. 620, 631 (1996) (recognizing that “most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons”). Even if classifications resulted, they are reasonably related to a legitimate government interest.
 
 See id.
 
 at 631 (noting that, under the United States Constitution’s Equal Protection Clause, if a law does not implicate a suspect class, it will be upheld so long as the law is rationally related to a legitimate government interest);
 
 Rico,
 
 121 Nev. at 703, 120 P.3d at 817 (noting that, under principle of equal protection based on Nevada’s Constitution, if a law does not implicate a suspect class, it will be upheld so long as the law is reasonably related to a legitimate government interest);
 
 Debates & Proceedings of the Nevada State Constitutional Convention of 1864,
 
 at 140, 693 (Andrew J. Marsh off. rep., 1866).
 

 [56]
 

 The Washoe County Registrar of Voters has joined in all of the Legislature’s arguments with respect to Article 15, Section 3(2)’s constitutional validity but, as discussed further below,
 
 see infra
 
 note 59, provided argument with respect to only one of those issues.
 

 [57]
 

 Massey v. Secretary of State,
 
 579 N.W.2d 862, 865 (Mich. 1998).
 

 [58]
 

 Id. (quoting
 
 Board of Liquidation, Etc.
 
 v.
 
 Whitney-Central T. & S. Bank,
 
 122 So. 850, 851 (La. 1929)).
 

 [59]
 

 Nev. Const. art. 19, § 2(4). The Washoe County Registrar of Voters provided argument only with respect to whether the 1996 ballot question complied with Article 19, Section 2(4)’s “in the same manner” requirement.
 

 [60]
 

 Nevada Judges Ass’n v. Lau,
 
 112 Nev. 51, 61 n.2, 910 P.2d 898, 904 n.2 (1996). Moreover, in this court’s order denying rehearing of
 
 Lau,
 
 we suggested that the Secretary of State present the term-limit initiative to the voters in the 1996 general election in a certain manner and correspondingly noted that the suggested manner, which the Secretary of State ultimately adopted, “presentfed] the same language and proposal as was contained in the 1994 ballot question; and . . . this meets the [constitutional requirement that the ballot question be resubmitted to the voters ‘in the same manner.’ ”
 
 Nevada Judges Ass’n v. Lau,
 
 Docket No. 26177 (Order Denying Rehearing, April 30, 1996).
 

 [61]
 

 117 Nev. 169,
 
 111
 
 n.22, 18 P.3d 1034, 1039 n.22 (2001).
 

 [62]
 

 See Black’s Law Dictionary
 
 1443 (8th ed. 2004) (defining
 
 “stare
 
 decisis” as the “doctrine of precedent, under which it is necessary for a court to follow earlier judicial decisions when the same points arise again”);
 
 see also Stocks
 
 v.
 
 Stocks,
 
 64 Nev. 431, 438, 183 P.2d 617, 620 (1947) (noting that the doctrine of stare decisis is “indispensable to the due administration of justice”);
 
 Grotts
 
 v.
 
 Zahner,
 
 115 Nev. 339, 342, 989 P.2d 415, 417 (1999) (Rose, J., dissenting) (noting that the doctrine of stare decisis serves “ ‘societal interests in . . . consistent, and predictable application of legal rules’ ” (quoting
 
 Thomas
 
 v.
 
 Washington Gas Light Co.,
 
 448 U.S. 261, 272 (1980))).
 

 [63]
 

 Bowler v. Vannoy,
 
 67 Nev. 80, 215 P.2d 248 (1950);
 
 Stocks,
 
 64 Nev. at 438, 183 P.2d at 620;
 
 Ex Parte Woodburn,
 
 32 Nev. 136, 104 P. 245 (1909);
 
 Kapp v. Kapp,
 
 31 Nev. 70, 73, 99 P 1077, 1078 (1909);
 
 see also Grotts,
 
 115 Nev. at 342, 989 P.2d at 417 (Rose, J., dissenting) (recognizing that the doctrine of stare decisis imposes a significant burden on the party requesting that a court disavow one of its precedents and that a court generally will not disavow one of its precedents unless serious detriment prejudicial to the public interest is demonstrated);
 
 cf. Douglas Disposal, Inc.
 
 v.
 
 Wee Haul, LLC,
 
 123 Nev. 552, 557, 170 P.3d 508, 512 (2007) (noting that the party challenging a statute’s constitutionality bears the burden to demonstrate that it is clearly unconstitutional);
 
 Emeterio v. Clint Hurt and Assocs.,
 
 114 Nev. 1031, 1034, 967 P.2d 432, 434 (1998) (noting that “[w]hen an appellate court states a rule of law necessary to a decision, that rule becomes the law of the case and must be followed throughout subsequent proceedings”).
 

 [64]
 

 See Grotts,
 
 115 Nev. at 342, 989 P.2d at 417 (Rose, J., dissenting) (quoting
 
 Maki
 
 v.
 
 Frelk,
 
 239 N.E.2d 445, 447 (Ill. 1968)).
 

 [65]
 

 Kapp,
 
 31 Nev. at 73, 99 P. at 1078 (noting that, once a question has been squarely presented and decided by this court, it should not be “ ‘unsettled, except for very weighty and conclusive reasons’ ” (quoting
 
 Evans v. Cook,
 
 11 Nev. 69, 75 (1876))).
 

 [66]
 

 The Legislature contends that the ballot questions confused voters for at least three reasons: (1) the ballot questions failed to adequately explain to voters what precisely constitutes a “state office” and “local governing body”; (2) the ballot questions’ language did not specifically state whether the proposed term limits were lifetime bans from office once the candidate served the maximum number of years, or only periodic bans, under which a candidate,
 
 *598
 
 after serving in office the maximum number of consecutive years allowed, would be eligible to run for that office again after waiting for a prescribed period; and (3) it impermissibly combined multiple subjects, rather than a single subject, into one initiative.
 

 [67]
 

 Carson City
 
 v.
 
 Price,
 
 113 Nev. 409, 412, 934 P.2d 1042, 1043 (1997) (quoting
 
 Building & Constr. Trades v. Public Works, 108
 
 Nev. 605, 610-11, 836 P.2d 633, 636-37 (1992)).
 

 [68]
 

 Building & Constr. Trades,
 
 108 Nev. at 611, 836 P.2d at 637.
 

 [69]
 

 See Herbst Gaming, Inc. v. Sec’y of State,
 
 122 Nev. 877, 883, 141 P.3d 1224, 1228 (2006).
 

 [70]
 

 As the primary election is imminent and it appears that the ballots therefore have already been printed, we deny as moot any relief directed at the 2008 primary election.